# Illinois Official Reports

## Appellate Court

*People v. Jenk*, 2016 IL App (1st) 143177

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID JENK, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-3177 |
| Filed<br>Rehearing denied | August 15, 2016<br>September 20, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-DV-74550; the Hon. Laura Bertucci-Smith, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Allan A. Ackerman, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and John J. Sviokla II, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Connors and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, the circuit court of Cook County found defendant David Jenk guilty of misdemeanor domestic battery and sentenced him to one year of probation. On direct appeal, the defendant argues that (1) the statute allowing for the admission of his prior offenses of domestic violence (725 ILCS 5/115-7.4 (West 2012)) was unconstitutional, (2) the trial court erred in admitting into evidence his prior acts of domestic violence against the victim, and (3) the trial court erred in finding the victim credible at trial. For the following reasons after allowing the defendant's posttrial argument motion to cite additional authority and having included that authority in our analysis, we affirm the judgment of the circuit court of Cook County.

¶ 2                                BACKGROUND

¶ 3        On August 7, 2013, the defendant was charged with misdemeanor domestic battery against his girlfriend, A.C.R., in connection with an incident that occurred on June 9, 2013. On January 21, 2014, the State filed a motion for proof of prior bad acts (motion to admit), seeking to introduce evidence of the defendant's six prior bad acts of domestic violence against A.C.R. Specifically, the State alleged that, pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2012)), evidence of the prior bad acts was admissible at trial because they occurred close in proximity of time to the charged offense; the prior bad acts were sufficiently similar to the charged offense; and they were relevant to show motive, intent, absence of mistake, and defendant's propensity to commit crimes of domestic violence. On January 30, 2014, the defendant filed a combined response to the State's motion and a motion *in limine*, arguing that the alleged six prior bad acts of domestic violence, for which he was never charged, were inadmissible on the basis that the statute was unconstitutional in violation of his equal protection and due process rights.

¶ 4        On March 18, 2014, prior to the start of trial, a hearing on the State's motion to admit was held during which the State described the six incidents of prior bad acts involving the defendant and A.C.R. that occurred on July 20, 2011; February 10, 2012; February 26, 2012; August 18, 2012; January 11, 2013; and May 2, 2013. The State asserted that evidence in the form of photographs was available to corroborate the February 10, February 26, and August 18 incidents. Medical testimony was also available to corroborate the February 26 incident. Defense counsel argued against the admissibility of the six prior bad acts on the basis that they were more prejudicial than probative and that the statute under which these prior bad acts may be admissible was unconstitutional in violation of equal protection and due process rights. The trial court, after considering the parties' arguments, found that all of the prior bad acts were close in time to the charged offense; that all of the prior incidents, except for the January 11 and May 2 incidents, were factually similar; and that the July 20, January 11, and May 2 incidents lacked any corroborating evidence to warrant inclusion. However, the trial court found the three remaining incidents dated February 10, February 26, and August 18 to be admissible at trial because they were supported by corroborating evidence, and the probative value of the evidence outweighed the prejudicial effect. The case then proceeded to a bench trial.

¶ 5        At trial, A.C.R. testified that she was 27 years old and had dated the defendant from 2011 to July 2013. On June 8, 2013, she and the defendant were at a graduation party for a friend,

which was held at the defendant's condominium. She arrived at the party at about 7:30 p.m. The defendant and A.C.R. consumed alcohol at the party and both became intoxicated that evening. At some point, they, along with their friends, left the graduation party and went to an upscale bar called the Paris Club, where they continued to drink alcohol. When they left the Paris Club at 3 a.m. on June 9, 2013, she and the defendant took a taxicab to her apartment at 1434 North Greenview Avenue in Chicago, where she lived alone. En route, the couple began to argue inside the taxicab and continued to argue when they arrived at their destination and walked through a courtyard leading to her apartment unit. Once inside, the couple engaged in a physical fight. A.C.R. recalled seeing a "hand come at the left side of [her] face," after which she lost consciousness. When she awoke on the ground covered in blood, the defendant was cleaning the blood on the floor with a paper towel. A.C.R. looked in the mirror and noticed that her face was severely swollen with a large gash over her right eye. After A.C.R. changed into loose-fitting clothing, the defendant cleaned her bloody clothes. A.C.R. felt pain above her right eye and begged the defendant to take her to the emergency room, but the defendant told her that she deserved everything that happened to her. Eventually, the defendant took A.C.R. to Rush University Medical Center (Rush Hospital), where she was admitted into the emergency room and received five stitches above her right eye. The defendant was present during her hospital treatment, and A.C.R. gave a false account to hospital personnel regarding what had occurred, telling them that she was "jumped" on her way home. A.C.R. testified that both she and the defendant agreed to give this fictitious account. A police officer later arrived at the hospital to speak with A.C.R., who lied by saying that she was attacked getting out of a taxicab on her way home. The defendant was also present during A.C.R.'s conversation with the officer. As soon as the police officer exited the room, A.C.R. and the defendant left the hospital against the advice of A.C.R.'s treating physician, who had recommended a CAT scan as a result of the trauma to her face. A.C.R. felt terrified and, despite being in pain, returned to her apartment with the defendant. At that time, she was still in love with the defendant. She did not contact her friends and family for a few days because she was embarrassed and did not know what to say. Eventually, she lied to her parents by telling them that she was in a car accident, a story that was fabricated by the defendant. Two days later, on June 11, 2013, A.C.R., who was still unable to use her left arm and was in excruciating pain, received further treatment for her injuries at St. Joseph Hospital. At St. Joseph Hospital, A.C.R., who was accompanied by the defendant, received X-rays which revealed a fracture of her left arm. Her arm was then put into a cast. She told the medical staff at St. Joseph Hospital that her injuries resulted from being in a car accident. At trial, she testified that she and the defendant both took photographs of her injuries after the June 9, 2013, incident and after a subsequent visit to an orthopedic surgeon. She identified the photographs depicting her injuries as People's Exhibit Nos. 1 to 13, which were then admitted into evidence without objection at trial. Although A.C.R. had health insurance through her employer, she received a hospital bill in July 2013 for thousands of dollars, for which she was responsible for $150 in out-of-pocket expenses. She contacted the defendant, who agreed to pay for her medical expenses and gave her a check dated July 15, 2013, with the following written on the memo line of the check: "settlement of medical bills." Subsequently, A.C.R. received a second medical bill, for which she requested payment from the defendant. However, the defendant requested an electronic copy of the second bill and acknowledged receipt after A.C.R. sent it, but never paid the bill. A.C.R. further testified that after June 11, 2013, she remained in a dating relationship with the defendant because she was still in love with him, claiming that they continued to share some "happy days." On July 25,

- 3 -

2013, A.C.R. ended her relationship with the defendant after he failed to show up for her doctor's appointment to have her cast removed. She testified that she felt betrayed by the defendant's absence at that time. In August 2013, A.C.R. traveled to New York with her mother, where A.C.R. finally revealed to her mother the truth about the June 9, 2013, incident. Upon their return to Chicago, A.C.R. reported the June 9, 2013, incident in person to the police. This marked the first time she had ever reported the defendant's abuse to the police. When questioned why she waited until August 2013 before reporting the physical abuse to the police, A.C.R. explained the delay by stating that she was scared, fearful, afraid for her life, and still in love with the defendant.

¶ 6    At trial, A.C.R. also testified to three prior instances of abuse by the defendant. She recalled that on February 10, 2012, she went out with the defendant and his mother after work. Afterwards, while walking to the defendant's car, A.C.R. and the defendant got into an argument about their shared dog. They pushed and pulled each other before the defendant dragged A.C.R. and pounded her head into the cement floor of the parking garage. He also ripped out her ear piercings from the cartilage and broke her purse. A.C.R. sustained welts on the back of her head. She then managed to grab the defendant's car keys, ran toward his car, and started the car. The defendant then opened the driver's side door of the car and began choking her with the seat belt by wrapping it around her neck. As both struggled for the wheel, A.C.R. stepped on the gas pedal and ran his car into a pole in the parking garage. After the crash, A.C.R. ran toward the elevator with the defendant in pursuit. He ultimately caught up to her, forcefully pulled her back into his car, threw her into the passenger seat, and drove her home. During the ride home, the defendant became hysterical and began punching and smashing his forehead into the steering wheel. When A.C.R. started to call his mother, the defendant punched her in the face. A.C.R. began to bleed and thought she had a broken nose. As a result of this incident, A.C.R. sustained a bloody nose, black and blue marks above her eye, welts on her back, and had her earrings torn out. After the February 10, 2012, incident, A.C.R. documented these injuries by taking photographs, which were admitted without objection at trial as People's Exhibit Nos. 18, 19, and 20.

¶ 7    A.C.R. further testified to another prior incident on February 26, 2012, when the defendant and A.C.R. invited friends over to his parents' condominium where the defendant lived at that time. They were drinking that evening, and after the guests left, A.C.R. stayed up to clean while the defendant slept in his bedroom. At about 3 a.m., A.C.R. kissed the defendant while he was sleeping and woke him up. The defendant became enraged and screamed at her, while A.C.R. locked herself in a nearby guest bedroom. The defendant broke down the guest bedroom door and entered the room, where he grabbed the back of her head by her hair and repeatedly slammed her face into the wood flooring. A.C.R. felt pain in her chin and screamed. Neighbors heard A.C.R.'s screams and notified the police, who then arrived at the scene. A.C.R. had "massive hemorrhaging" to her chin, but wore a "zip up" to cover her injury. Although A.C.R. was pulled aside by one of the two officers, she did not tell him the truth and only told him that she and the defendant were arguing. A few hours later, A.C.R., accompanied by the defendant, sought medical treatment at Rush Hospital, where the medical staff took X-rays of her chin. She lied to the medical staff by telling them that she fell while getting out of the shower. At the time of trial, A.C.R.'s chin was still deformed and a scar remained as a result of the February 26, 2012, incident. Photographs of those injuries, taken by A.C.R. and

the defendant, were admitted into evidence without objection at trial as People's Exhibit Nos. 21 to 25.

¶ 8     A.C.R. also testified to a third prior incident that occurred on August 18, 2012, during which the couple got into an argument that escalated into pushing and shoving before A.C.R. ended up on her knees in front of the defendant. The defendant then grabbed her head and kneed her in the face. A.C.R. sustained a scratch on her right cheek, as well as swelling and bruising. Although A.C.R. did not seek medical treatment for these injuries, she took off a week from work by lying to her coworkers that she had been hit in the face by a softball—a sport she had never played. Immediately after this incident, A.C.R. documented her injuries in photographs which showed scabs, a black and blue eye, and a swollen cheek and which were admitted without objection at trial as People's Exhibit Nos. 26 to 30.

¶ 9     Nurse Robert Wuthenow (Nurse Wuthenow), who treated A.C.R. in the emergency department at Rush Hospital, testified that A.C.R. and the defendant arrived at the hospital at about 10 a.m. on June 9, 2013. A.C.R. had swelling to the left jaw, a laceration to the right eyebrow, and some bruising on the right forearm, which A.C.R. attributed to injuries she sustained from an unknown assailant on her way home from a bar that evening. A.C.R. indicated to Nurse Wuthenow that she was intoxicated at the time of the attack. Rush Hospital then notified the police, who interviewed A.C.R. at the hospital. A.C.R. then left the hospital against the advice of the medical staff and failed to finish the recommended CAT scan. On cross-examination, Nurse Wuthenow testified that A.C.R. told him that she never lost consciousness during the incident, but that he could not recall whether the defendant was in the treatment room with A.C.R. when the police spoke with her.

¶ 10     Nurse Candida Nunez (Nurse Nunez) testified that she worked in the emergency department at St. Joseph Hospital on June 11, 2013, when A.C.R. arrived at the hospital. Although Nurse Nunez could not recall why A.C.R. needed treatment, she applied a cast and sling on A.C.R.'s arm based on a doctor's directives.

¶ 11     Nurse Practitioner Erica Gaddy (Nurse Gaddy) testified that she worked in the emergency department of Rush Hospital on February 26, 2012, when A.C.R. was admitted for chin pain, headache, and jaw pain. Nurse Gaddy observed a large bruise on A.C.R.'s chin, which was swollen and had a pocket of blood. A.C.R., who then received pain medication and an X-ray, told Nurse Gaddy that her injuries resulted from slipping and falling in the shower. Nurse Gaddy recalled that someone else was present when she spoke with A.C.R., but that she did not know the identity of that person.

¶ 12     Officer Debbie Stolfe (Officer Stolfe) testified that at about 10:30 a.m. on June 9, 2013, she was dispatched to an emergency treatment room at Rush Hospital where she spoke with A.C.R. Officer Stolfe observed a cut to A.C.R.'s right eyebrow, bruising on her arms and left cheek, and red marks on the front of her neck. Officer Stolfe could not remember whether anyone else was present during her conversation with A.C.R., who informed the officer that at about 3:30 a.m., she was coming home from a night of partying and drinking when an unknown male assailant tried to grab her purse and struck her in the face. The unknown assailant ran away when A.C.R. started kicking and screaming, after which A.C.R. notified her boyfriend about the incident. A.C.R. also informed Officer Stolfe that it was not until several hours later, at about 10:30 a.m., that the defendant drove her to Rush Hospital. Although Officer Stolfe found this delay to be odd, she did not ask any follow-up questions about it. A.C.R. did not receive

any medical treatment prior to arriving at Rush Hospital. During the conversation, Officer Stolfe noticed that A.C.R. was fully aware of her surroundings and did not slur her words.

¶ 13 Officer Richard Revolorio (Officer Revolorio) testified that on August 6, 2013, A.C.R. and her parents arrived at the police station to file a police report against the defendant regarding the June 9, 2013, incident. A.C.R. was crying and her parents were also emotional. Officer Revolorio noticed that A.C.R. had a bandaged wrist and laceration or injury on one side of her face.

¶ 14 Following Officer Revolorio's testimony at trial, the State rested. The trial court then denied defense counsel's motion for a directed finding of acquittal. The defense elected not to call any witnesses, and the trial court admitted into evidence several defense exhibits (Defendant's Exhibit Nos. 1 to 9), which were text messages and photographs introduced during A.C.R.'s cross-examination testimony. Following closing arguments, the trial court found the defendant guilty of the charged crime, finding A.C.R.'s testimony to be credible. Thereafter, the defendant was sentenced to one year of probation, along with mandated domestic violence counseling classes and an order of protection against him.

¶ 15 On August 20, 2014, the trial court denied the defendant's motion for a new trial. On September 26, 2014, the defendant filed a timely notice of appeal, which conferred jurisdiction upon this court pursuant to Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013), and Rule 606 (eff. Jan. 1, 2013).

¶ 16 ANALYSIS

¶ 17 We determine the following relevant issues on appeal: (1) whether the statute allowing for the admission of the defendant's prior offenses of domestic violence against A.C.R. was unconstitutional; (2) whether the trial court erred in admitting into evidence the defendant's three prior acts of domestic violence against A.C.R.; and (3) whether the trial court erred in finding the defendant guilty of the charged offense on the basis that the court believed A.C.R.'s trial testimony to be credible.

¶ 18 We first determine whether section 115-7.4 of the Code, the statute allowing for the admission of the defendant's prior offenses of domestic violence against A.C.R., was unconstitutional.

¶ 19 The defendant challenges the constitutionality of section 115-7.4 of the Code by arguing that it violated the equal protection and due process clauses of the Illinois and United States Constitutions. He argues that there was no rational basis for the admission of other-crimes evidence where he has no prior criminal record, was not charged with these alleged prior bad acts, and was only charged with a misdemeanor domestic battery offense in the instant case. He further argues that other defendants charged with more serious crimes such as murder, drug-trafficking, and weapon-related offenses are afforded greater protections by Illinois courts concerning the admissibility of other-crimes evidence than he who was charged only with a misdemeanor.

¶ 20 The State argues that section 115-7.4 of the Code is constitutional, arguing that it is rationally related to the legitimate governmental purpose of promoting the prosecution of domestic violence, a family of crimes that have historically been difficult to prosecute. The State argues that our supreme court's decision in *People v. Dabbs*, 239 Ill. 2d 277 (2010), has already rejected as meritless the defendant's due process arguments with respect to the statute.

Further, the State argues that the defendant's equal protection claims fail also because the statute is rationally related to the prosecution of recidivist abusers, whose victims are often reluctant to testify.

¶ 21 A constitutional challenge to a statute may be raised at any time and is subject to *de novo* review. *People v. Robinson*, 2011 IL App (1st) 100078, ¶ 12. Statutes carry a strong presumption of constitutionality and a party challenging the constitutionality of a statute has the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). To rebut the presumption, the challenging party must clearly establish a constitutional violation. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009). We must construe a statute so as to uphold its constitutionality, if reasonably possible to do so. *People v. Dinelli*, 217 Ill. 2d 387, 397 (2005). Thus, any doubt as to the construction of a statute will be resolved in favor of its validity. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 307 (2008).

¶ 22 Section 115-7.4 of the Code states in relevant part the following:

"(a) In a criminal prosecution in which the defendant is accused of an offense of domestic violence ***, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.

(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." 725 ILCS 5/115-7.4 (West 2012).

¶ 23 In Illinois, it is well settled that as a common-law rule of evidence, evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes. *Dabbs*, 239 Ill. 2d at 283. Such purposes include, but are not limited to, to show motive, intent, identity, and accident or absence of mistake. *Id.* Even if offered for a permissible purpose, such evidence will not be admitted if its prejudicial effect substantially outweighs its probative value. *Id.* at 284. The rationale for this rule is not that a defendant's bad character, as evinced by other bad acts, is irrelevant when he is charged with a crime; rather, the rule is grounded in the concern that such evidence proves too much. *Id.* By enacting section 115-7.4 of the Code, however, the legislature has abrogated, in part, this common-law propensity rule as it creates an exception by allowing the admission of propensity evidence in domestic violence cases. *Id.* at 284-85, 288; *People v. Chapman*, 2012 IL 111896, ¶ 32 (citing *Dabbs* holding that section 115-7.4 of the Code allows for the admission of propensity evidence).

¶ 24 In the case at bar, the defendant specifically argues that section 115-7.4 is unconstitutional as it violates his right to due process because it allows for evidence of prior bad acts to be "presumptively admissible" under the statute. We find the defendant's argument to be without merit as it has already been squarely rejected by our supreme court in *Dabbs*.

¶ 25 In *Dabbs*, following a jury trial wherein the defendant's ex-wife testified that he had abused her, the defendant was convicted of domestic battery against his girlfriend. *Dabbs*, 239 Ill. 2d at 280. The ex-wife's testimony was admitted pursuant to section 115-7.4 of the Code, which allows the admission of evidence of a defendant's other acts of domestic violence in a domestic violence prosecution. *Id.* On appeal, the *Dabbs* defendant, like the defendant in the

case at bar, argued that section 115-7.4 was unconstitutional. *Id.* Before our supreme court, the *Dabbs* defendant argued that, in enacting section 115-7.4, the legislature made evidence of a defendant's other acts of domestic violence admissible "without regard to its relevance or to the balance of probative value and risk of undue prejudice." *Id.* at 288. The *Dabbs* court rejected this argument, finding that section 115-7.4 had abrogated, in part, the Illinois common-law evidentiary rule that evidence of other crimes is inadmissible to show a defendant's propensity to commit crimes. *Id.* at 284. Furthermore, our supreme court noted that the legislature "specifically provided that other-crimes evidence 'may be considered for its bearing on any matter to which it is relevant' " (*id.* at 290 (quoting 725 ILCS 5/115-7.4(a) (West 2012))) and that "the statute lists three factors to be considered in weighing the probative value of the evidence against undue prejudice to the defendant [citation] in addition to any other factors that the court might ordinarily consider." (Internal quotation marks omitted.) *Id.* at 290-91. Because of this, the *Dabbs* court held that "the plain meaning of section 115-7.4 of the Code is that the evidence of a defendant's commission of other acts of domestic violence may be admitted in a prosecution for one of the offenses enumerated in the statute, so long as the evidence is relevant and its probative value is not substantially outweighed by the risk of undue prejudice." *Id.* at 291. The *Dabbs* court further held that, under the rational basis test, the statute does not violate a defendant's due process rights because it serves a legitimate governmental purpose of promoting effective prosecution of domestic violence crimes in which victims are often reluctant to testify against abusers or their court testimony may be affected by fear or anxiety and the admission of evidence that the defendant has committed other crimes of domestic violence is rationally related to that purpose. *Id.* at 293-94; accord *Chapman*, 2012 IL 111896, ¶ 32 (citing *Dabbs* holding that section 115-7.4 did not violate due process and that "the propensity rule is of common law origin and not of constitutional dimension"). Thus, in the case at bar, under the controlling precedent of *Dabbs*, the defendant's due process claim cannot stand, and we reject his argument that evidence of prior acts of domestic violence is "presumptively admissible" under the statute—as the plain language of the statute dictates that a court may only admit such evidence if it is relevant and the risk of prejudice does not outweigh its probative value. Further, although the defendant points out that he has no prior criminal record, was never charged with these alleged prior bad acts, and was only charged with a misdemeanor domestic battery offense in the instant case, we find that the argument he makes does not address the admissibility of prior acts under section 115-7.4 of the Code.

¶ 26    The defendant urges this court not to follow *Dabbs*, arguing that there is "some authority" supporting his argument that admission of other-crimes evidence can rise to the level of a due process violation, by citing *United States v. Morena*, 547 F.3d 191 (3d Cir. 2008), and *Bigby v. Cockrell*, 340 F.3d 259 (5th Cir. 2003). We reject the defendant's argument. First, aside from decisions by the United States Supreme Court, decisions by lower federal courts are persuasive but not binding on Illinois reviewing courts. See *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 834-36 (2004). We, however, are bound by the decisions of the Illinois Supreme Court. *Id.* at 836. Second, neither *Morena* nor *Cockrell* is persuasive, as these cases do not concern section 115-7.4 of the Code and both predate *Dabbs*. *Morena* involved a reversal of defendant's weapon convictions on the basis of prosecutorial misconduct in violation of due process, where although the court had initially ruled that evidence of defendant's drug use and dealing was admissible to show motive, the State repeatedly crossed

the line at trial by systematically injecting the drug evidence with no apparent proper purpose, despite explicit warnings by the trial court not to do so. *Morena*, 547 F.2d at 194-96. The *Cockrell* decision is no longer good law as it was withdrawn and replaced by a subsequent decision, *Bigby v. Dretke*, 402 F.2d 551 (5th Cir. 2005), which held that prejudicial evidence admitted during defendant's capital murder trial regarding his attack on the trial judge, even if it violated defendant's due process rights, did not have "substantial and injurious" effect on the jury's guilty verdict in light of the overwhelming evidence of his guilt for murder. *Id.* at 564. Neither *Morena* nor *Dretke* is applicable to the facts of the case at bar. Therefore, we see no reason to deviate from our supreme court's holding in *Dabbs* that the admission of other-crimes evidence pursuant to section 115-7.4 does not violate due process. Accordingly, the defendant's due process claim must fail.

¶ 27　　The defendant further argues that section 115-7.4 of the Code is also unconstitutional because it violates equal protection guarantees in that other defendants charged with more serious crimes such as murder, drug-trafficking, and weapon-related offenses are afforded greater protections concerning the admissibility of other-crimes evidence than he who was charged only with misdemeanor domestic battery. He contends that the admission of his prior acts of domestic violence for propensity purposes violated his equal protection rights.

¶ 28　　The State counters that the defendant's equal protection claim fails because section 115-7.4 is rationally related to the prosecution of recidivist abusers, whose victims are often reluctant to testify. The State argues that while our supreme court in *Dabbs* did not address the merits of the defendant's equal protection challenge to section 115-7.4 under state and federal constitutions because the defendant had only raised this point before the appellate court but had abandoned the argument by the time the case reached our supreme court (*Dabbs*, 239 Ill. 2d at 294), the appellate court, whose opinion the *Dabbs* court affirmed, *did* address the equal protection issue and found it to be without merit. See *People v. Dabbs*, 396 Ill. App. 3d 622 (2009). We agree that the appellate court's equal protection analysis in *Dabbs* is sound, and we likewise adopt it.

¶ 29　　In conducting an equal protection analysis, we apply the same standards under the United States Constitution and the Illinois Constitution. *In re Derrico G.*, 2014 IL 114463, ¶ 88. The equal protection clause guarantees that similarly situated individuals will be treated in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently. *Id.* The equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people, but it does prohibit the government from doing so on the basis of criteria wholly unrelated to the legislature's purpose. *Id.* Where no suspect class or fundamental rights are at issue, this court applies a rational basis scrutiny and considers whether the challenged classification bears a rational relationship to a legitimate governmental purpose. *Id.*

¶ 30　　In 2007, the Illinois General Assembly passed Public Act 95-360 (Pub. Act 95-360 (eff. Aug. 23, 2007)), which created section 115-7.4 of the Code. The bill was "modeled on the current treatment of evidence in cases of criminal sexual assault" set forth in section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2006)). 95th Ill. Gen. Assem., Senate Proceedings, May 28, 2007, at 47 (statements of Senator Harmon). It was created as a tool for law enforcement and victims because "domestic violence is a recurring crime in the same way that sexual abuse and sexual assault is." 95th Ill. Gen. Assem., House Proceedings, Apr. 25, 2007, at 46 (statements of Representative Gordon).

¶ 31    Section 115-7.4 of the Code is nearly identical to section 115-7.3 of the Code. The only major difference between the sections is the crime involved: section 115-7.3 deals with prior incidents of sexual abuse, while section 115-7.4 covers prior incidents of domestic violence. See 725 ILCS 5/115-7.3(b) (West 2006); 725 ILCS 5/115-7.4(a) (West 2012). Both sections provide that evidence that the defendant committed these prior crimes can be admissible and "may be considered for its bearing on any matter to which it is relevant." See 725 ILCS 5/115-7.3(b) (West 2006); 725 ILCS 5/115-7.4(a) (West 2012). They also identically list the three factors that a court may consider in weighing the probative value of the evidence against undue prejudice to the defendant. See 725 ILCS 5/115-7.3(c) (West 2006); 725 ILCS 5/115-7.4(b) (West 2012). Both our supreme and appellate courts have examined the constitutionality of section 115-7.3 (dealing with prior incidents of sexual abuse) and found it to be constitutional. See *People v. Donoho*, 204 Ill. 2d 159 (2003); *People v. Beaty*, 377 Ill. App. 3d 861 (2007).

¶ 32    In *Donoho*, our supreme court held that section 115-7.3 of the Code does not violate the equal protection clause. *Donoho*, 204 Ill. 2d at 177; accord *Beaty*, 377 Ill. App. 3d at 883. The *Donoho* court explained that section 115-7.3 is modeled after Federal Rules of Evidence 413 and 414 (Fed. R. Evid. 413, 414). *Donoho*, 204 Ill. 2d at 177. The *Donoho* court ruled that, like Rules 413 and 414, section 115-7.3 only had to pass the rational basis test because "[s]exual offense defendants are not a suspect class." *Id.*

¶ 33    Because our supreme court in *Donoho* has found section 115-7.3 to not be in violation of a defendant's equal protection rights, section 115-7.4, which is nearly identical to section 115-7.3, must also be constitutional under equal protection guarantees. We find that section 115-7.4 bears a rational relationship to a legitimate governmental purpose, and thus, it does not violate equal protection guarantees.

¶ 34    The defendant further argues that because propensity evidence is not allowed in more serious crimes such as murder, drug trafficking, and weapon-related offenses, it is irrational that he, who is charged only with misdemeanor domestic battery, should be subject to the admission of propensity evidence. In support, he cites a number of cases wherein courts have held that the admission of other-crimes evidence was prejudicial error. See *People v. Manning*, 182 Ill. 2d 193 (1998); *People v. Cruz*, 162 Ill. 2d 314 (1994); *People v. Thingvold*, 145 Ill. 2d 441 (1991); *People v. Starks*, 116 Ill. App. 3d 384 (1983); *People v. Barnes*, 182 Ill. App. 3d 75 (1989); *United States v. Beasley*, 809 F.2d 1273 (7th Cir. 1987); *United States v. Richards*, 719 F.3d 746 (7th Cir. 2013). We find the defendant's argument to be unpersuasive, as these cited cases deal with the common-law approach to other-crimes evidence as we have exhaustively explained. Therefore, the defendant's equal protection claim must fail. Accordingly, we hold that section 115-7.4 of the Code is not unconstitutional.

¶ 35    We next determine whether the trial court erred in admitting into evidence the defendant's three prior acts of domestic violence against A.C.R. It is within the sound discretion of the trial court to determine the admissibility of other-crimes evidence, and its decision will not be disturbed absent a clear abuse of discretion. See *Chapman*, 2012 IL 111896, ¶ 19. An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 39.

¶ 36    The defendant argues that a new trial is warranted by claiming that the trial court "prejudicially erred" in admitting evidence of his three prior incidents of domestic violence

against A.C.R., where the admission of such propensity evidence replaced the necessary proof required to convict him of the charged offense in the instant case.

¶ 37 The State argues that the trial court properly admitted evidence of the defendant's prior acts of domestic violence against A.C.R. pursuant to section 115-7.4 of the Code. The State points out that, in allowing the introduction of three out of six proposed prior incidents of domestic violence involving the defendant, the trial court properly found that the other-crimes evidence was relevant to establish the defendant's intent, the absence of mistake, his continued hostility toward A.C.R., and his propensity to commit acts of domestic violence. The State also argues that the trial court then carefully weighed the probative value of the other-crimes evidence against its prejudicial effect under section 115-7.4 of the Code, which was not an abuse of discretion.

¶ 38 Based on our review of the record, we cannot conclude that the trial court abused its discretion in admitting evidence of the three prior incidents of domestic violence involving the defendant and A.C.R. Prior to trial, a hearing on the State's motion to admit six incidents of prior domestic violence was held, during which the parties made arguments before the court. The trial court then found that, because three of the six prior incidents (July 20, 2011; January 11, 2013; and May 2, 2013) were not supported by any corroborating evidence, they were not admissible as the prejudicial effect of admitting those incidents would outweigh the probative value. The remaining three prior incidents (February 10, 2012; February 26, 2012; and August 18, 2012), however, were found to be admissible by the court because they were supported by corroborating evidence such that the probative value was not outweighed by the prejudicial effect of the evidence. The trial court further found that the February 10, February 26, and August 18 occurrences were relevant to show the defendant's motive, intent, or absence of mistake in harming A.C.R.[1] and that, in considering the statutory factors under section 115-7.4 of the Code, they were close in time to the charged offense and had a high degree of factual similarity to the instant case. See 725 ILCS 5/115-7.4 (West 2012) (enumerating factors for a court to consider in weighing the probative value of the evidence against undue prejudice). We find that in admitting the three specific prior incidents of domestic violence involving the defendant, the trial court properly considered the statutory factors and properly undertook the weighing process, by carefully balancing the probative value against the prejudicial effect of the evidence as required by section 115-7.4 of the Code. Thus, we cannot say that the trial court abused its discretion in admitting into evidence the prior incidents of February 10, February 26, and August 18. See *People v. Jackson*, 2014 IL App (1st) 123258, ¶¶ 42-45 (other-crimes evidence properly admitted under section 115-7.4 of the Code, where the prior acts were proximate in time to the charged offense, the prior incidents were factually similar to the

---

[1]Although not articulated by the trial court, evidence of the February 10, February 26, and August 18 incidents was also relevant as propensity evidence under section 115-7.4 of the Code, as the trial court had carefully applied the balancing test in weighing the probative value of the evidence against its prejudicial effect and had considered the statutory factors listed under the statute. See *People v. Ward*, 2011 IL 108690, ¶ 25 ("propensity evidence is often highly relevant"); *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 7 (the legislature, by enacting section 115-7.4 of the Code, has made exceptions to the common-law rule against the use of other-crimes evidence to show a defendant's propensity to commit crimes; evidence of a defendant's commission of prior qualifying offense may be admitted so long as the trial court, after weighing certain statutory factors, determines that the probative value of the evidence is not substantially outweighed by the risk of undue prejudice).

charged offense, and the trial court twice acknowledged that it undertook the weighing process in balancing the probative value against the prejudicial effect).

¶ 39    Nevertheless, the defendant argues that the trial court abused its discretion in admitting the three prior incidents of domestic violence, citing cases in which the reviewing court found error in the trial court's admission of other-crimes evidence: *People v. Barbour*, 106 Ill. App. 3d 993 (1982); *People v. Alford*, 111 Ill. App. 3d 741 (1982); *People v. McKee*, 52 Ill. App. 3d 689 (1977); *People v. Manning*, 182 Ill. 2d 193 (1998); *People v. Moore*, 2012 IL App (1st) 100857. We find these cases to be distinguishable, as none of them involves the offense of domestic violence or a similar type of secretive and recurring crime that could be difficult to prove. *Barbour*, *Alford*, *McKee*, and *Manning* all predate the enactment of section 115-7.4 of the Code, which became effective on August 23, 2007, and, as discussed, made exceptions to the common-law rule against the use of other-crimes evidence in establishing a defendant's propensity to commit crimes.

¶ 40    Relying on *People v. Pikes*, 2013 IL 115171, and *People v. Adkins*, 239 Ill. 2d 1 (2010), the defendant also argues that the three prior acts of domestic violence should not have been admitted because neither the State nor the trial court addressed the "continuing narrative" doctrine in admitting such evidence. We reject this contention as meritless. Evidence of other crimes may be admitted if it is part of the "continuing narrative" of the charged crime because such "uncharged crimes do not constitute separate, distinct, and disconnected crimes." *Pikes*, 2013 IL 115171, ¶ 20. The "continuing narrative" doctrine was not at issue in the case at bar, as the trial court properly admitted the other-crimes evidence as relevant for the purposes of demonstrating the defendant's motive, intent, or absence of mistake in harming A.C.R. Just because the trial court did not base its ruling on another permissible basis—the continuing narrative doctrine—did not necessarily mean that the trial court's ruling was erroneous. Thus, the defendant's argument on this basis must fail.

¶ 41    We likewise reject the defendant's challenge to the admission of other-crimes evidence on the basis that the amount of such evidence comprised, as measured by about 65 of the 205 pages of the trial transcript, approximately 30% of the State's case at trial. Citing to *Barbour*, 106 Ill. App. 3d 993, a rape case in which testimony about prior alleged rapes comprised of about 52% of the State's case, he argues that the admission of propensity evidence in the case at bar erroneously replaced the necessary proof required to convict him of the charged offense in the instant case. First, contrary to the defendant's calculation, our examination of the record shows that the entirety of the trial, from opening statements to the trial court's guilty finding, consisted of only 176 total pages and that A.C.R.'s testimony about the three prior incidents of domestic violence by the defendant consisted of about 27 pages of the transcript during the State's case-in-chief. Second, we find *Barbour* to be entirely inapposite to the case at bar. In *Barbour*, the reviewing court had held that the other-crimes evidence "had no permissible use," whereas here, the evidence had a number of permissible purposes for which it could be used—including to show the defendant's propensity to commit domestic violence under section 115-7.4 of the Code. See *People v. Ross*, 395 Ill. App. 3d 660, 677 (2009) (distinguishing *Barbour* on grounds where other-crimes evidence was admitted to show motive, lack of consent, and propensity). Thus, the defendant is not entitled to relief under *Barbour*. See *People v. Null*, 2013 IL App (2d) 110189, ¶ 44 (rejecting defendant's contention that admission of other-crimes evidence became the focus of the trial, where evidence of other crimes accounted for a mere 250 pages of the trial record and evidence of the charged crime

constituted 1200 pages). Accordingly, we conclude that the trial court did not abuse its discretion in admitting the three prior incidents of domestic violence, where its ruling was not arbitrary, fanciful, or unreasonable.

¶ 42    We next determine whether the trial court erred in finding the defendant guilty of the charged offense on the basis that the court believed A.C.R.'s trial testimony to be credible.

¶ 43    The defendant argues that a new trial is warranted on the basis that the trial court should not have accepted A.C.R.'s trial testimony as credible, claiming that it was inherently improbable and that the trial court's comments during its ruling showed that it used impermissible "private knowledge" *dehors* the record to render the guilty verdict against him.

¶ 44    The State counters that the trial court's credibility determination was reasonable and correct, arguing that the evidence at trial overwhelmingly established the defendant's guilt and the trial court did not consider any improper evidence in finding him guilty of the charged crime.

¶ 45    Although unclear in the defendant's opening brief, we find that his arguments, which he confirms in the reply brief, essentially challenge the sufficiency of the evidence at trial.

¶ 46    When the sufficiency of the evidence is challenged on appeal, we must determine " 'whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Graham*, 392 Ill. App. 3d 1001, 1008-09 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court affords great deference to the trier of fact and does not retry the defendant on appeal. *People v. Smith*, 318 Ill. App. 3d 64, 73 (2000). It is within the province of the trier of fact "to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence." *Graham*, 392 Ill. App. 3d at 1009. The trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the State. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *Graham*, 392 Ill. App. 3d at 1009.

¶ 47    A person commits domestic battery "if he or she knowingly without legal justification by any means: (1) [c]auses bodily harm to any family or household member; (2) [m]akes physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2 (West 2012).

¶ 48    Viewing the evidence in the light most favorable to the State, we find that the trier of fact could reasonably have found that the defendant committed domestic battery upon A.C.R. on June 9, 2013. A.C.R. testified in detail at trial about the verbal and physical altercation that transpired between the defendant and herself on June 9, 2013, including how, after arriving home with the defendant from a night of partying and drinking, they argued and engaged in a physical fight that resulted in her being hit on the left side of her face before losing consciousness. Although A.C.R. did not testify to actually seeing the defendant's hand hit her face, because no one else was inside the apartment during the fight and A.C.R. testified that the defendant later told her that she deserved everything that happened to her, a trier of fact could reasonably infer that the defendant had hit her in the face. A.C.R. testified that she awoke on

the floor covered in blood and noticed her face was severely swollen with a large gash over her right eye. A.C.R. also testified that she eventually sought treatment at Rush Hospital, where she received five stitches over her right eye. Two days after the altercation, A.C.R. was still in pain and unable to use her left arm, for which she sought further medical treatment at St. Joseph Hospital, where X-rays revealed a fracture of her left arm requiring it to be put into a cast. A.C.R. did not report the physical abuse to the police until August 2013, and at trial, she explained the delay by testifying that she was scared to report the defendant and, further, she was still in love with the defendant at the time of the incident. Photographic evidence depicting the injuries sustained from the June 9, 2013, incident was admitted into evidence. A.C.R. further testified to three prior incidents in which the defendant deliberately hit, punched, and injured her in 2012. The State also presented testimonial evidence by Nurse Wuthenow, Nurse Nunez, and Nurse Gaddy, who testified to the extent of A.C.R.'s injuries during A.C.R.'s June 9, 2013; June 11, 2013; and February 26, 2012, hospital visits, respectively. Based on this evidence, we conclude that the trier of fact could reasonably have concluded that the defendant committed domestic battery upon his girlfriend, A.C.R., on June 9, 2013.

¶ 49     In finding the defendant guilty, the trial court rejected defense counsel's argument that A.C.R. could not be trusted in light of her repeated lies to others about what really occurred on June 9, 2013. The court found that photographs and medical evidence corroborated A.C.R.'s testimony at trial, noting that although she had previously lied to others about what had really occurred on June 9, 2013, the "changing of her stories actually added to her credibility" because they were designed to protect the defendant at the time of the incidents. Had A.C.R. not actually been a victim of domestic violence and "something else had happened," the court reasoned, she would have "stuck to the one story, and it wouldn't have changed like two or three [times]." The trial court noted that while A.C.R. had misled others about the truth of what had happened, the act of photographing her injuries corroborated, rather than undermined, what A.C.R. testified to at trial: "[s]o every time she gets mysteriously injured, she takes pictures of herself because she wants to ultimately hold it against her boyfriend of two and a half years? I don't think that makes any sense to be honest. I know that's what the defense is trying to argue, but I just don't think that's credible." The trial court further found that A.C.R. likely stayed in the relationship despite the physical abuse because she loved the defendant and that A.C.R. fabricated lies about her injuries at the time of the various incidents in order to protect the defendant.

¶ 50     Notwithstanding the foregoing, the defendant challenges the sufficiency of the trial evidence, by first arguing that the trial court erred in finding A.C.R.'s testimony to be credible, where it was "inherently improbable" and an "oddity" for the trial court to conclude that A.C.R.'s shifting stories about how she had sustained her injuries actually enhanced her credibility. In support, the defendant cites a number of cases, which we find inapposite and distinguishable. See *People v. Wright*, 147 Ill. App. 3d 302 (1986); *People v. O'Connor*, 412 Ill. 304 (1952); *People v. Buchholz*, 363 Ill. 270 (1936); *People v. Kepler*, 76 Ill. App. 2d 135 (1966); *United States v. Rosenberg*, 416 F.2d 680 (7th Cir. 1969); *People v. Salinas*, 383 Ill. App. 3d 481, 502-05 (2008) (Cunningham, J., dissenting). None of these cases involves domestic battery convictions in which a victim might lie to protect the abuser. *Wright*, *O'Connor*, *Buchholz*, and *Kepler* are rape cases in which the reviewing courts reversed the defendants' convictions based on the defendant's "good reputation" (*Buchholz*) or where the complainants' testimony was not found to be "clear and convincing" (*Wright*, *O'Connor*, and

*Kepler*), a heightened standard that has been viewed as "sexist anachronism" and has since been abandoned in Illinois by our supreme court's decision in *People v. Schott*, 145 Ill. 2d 188 (1991). *Rosenberg* is a federal appellate case which concerns a conspiracy conviction and has nothing to do with assessing the sufficiency of the evidence based on a witness's testimony. The dissenting opinion in *Salinas*, a drug possession case, also does nothing to support defendant's argument. The dissent in *Salinas* points out that the State's main witness was "impeached as to a critical element of his testimony, coupled with his incredible testimony regarding how the drugs came to be discovered in the defendant's car," thereby requiring suppression of the defendant's statement to the police and, thus, necessitating reversal of his conviction. *Salinas*, 383 Ill. App. 3d at 502-03 (Cunningham, J., dissenting). We find this dissenting view in *Salinas* to be inapposite to the case at bar. Thus, the trial court's finding that A.C.R.'s testimony was credible, which was within its province as trier of fact to do so, should not be second-guessed by this court. *Sutherland*, 223 Ill. 2d at 242. Therefore, the defendant's argument on this basis cannot stand.

¶ 51    The defendant next attacks the sufficiency of the trial evidence by arguing that the trial court impermissibly used "private knowledge" *dehors* the record in making its ruling. The State counters this claim as meritless, arguing that the complained-of comments made during the trial court's ruling did not constitute the court's private knowledge.

¶ 52    The relevant comments by the trial court are as follows:

> "You know, we can all ask every day why a person like [A.C.R.] would stay in a relationship with a person who's battering them, but I don't think that, that's something that she did because she said she loved him, and *it's not the first time that's happened*, and so I think that it's completely credible that she stayed because she loved him even though he continued to batter her." (Emphasis added.)

Relying on *People v. Wallenberg*, 24 Ill. 2d 350 (1962), the defendant argues that the italicized portion of the court's comments shows that the trial court incorporated its personal knowledge in making its ruling, in violation of due process.

¶ 53    Deliberations of the trial court are limited to the record, and any determination based upon private knowledge of the court, untested by cross-examination, constitutes a denial of due process. *People v. Thomas*, 364 Ill. App. 3d 91, 99-100 (2006). Every presumption will be accorded the trial court that it considered only admissible evidence in reaching its conclusion. *Id.* at 100. However, a defendant may rebut this presumption with recorded statements by the trial court. *Id.*

¶ 54    We find *Wallenberg*, the defendant's cited authority, to be distinguishable from this case. In *Wallenberg*, the defendant's alibi maintained that at the time of the robbery he had a soft tire and was looking for a gas station on a certain route in the City of Chicago. *Wallenberg*, 24 Ill. 2d at 353. The trial court, in finding the defendant guilty, stated: " 'He told me there was no gas stations on that stretch of the street where he could get air. I happen to know different. I don't believe his story.' " *Id.* at 353-54. Our supreme court reversed the conviction, holding that it was error for the trial court to make a determination based on its personal knowledge. *Id.* at 354-55.

¶ 55    We find the case at bar to be distinguishable from *Wallenberg*. Viewing the complained-of remark within the context of the entirety of the court's ruling, we find that, unlike *Wallenberg*, it was a benign comment which did not form the basis of the court's finding that A.C.R. testified credibly about the specific facts pertaining to the abuse or its ultimate ruling in finding

- 15 -

the defendant guilty. Rather, the record shows that the trial court thoroughly summarized A.C.R.'s testimony about the June 9, 2013, incident that gave rise to the charged offense, as well as her testimony about the three prior incidents of domestic violence and the supporting photographic evidence, which formed the basis of the trial court's determination of guilt. Thus, we find that the defendant has not rebutted the presumption that the trial court only considered admissible evidence in reaching its conclusion. Accordingly, we hold that the evidence was sufficient to sustain the defendant's conviction for misdemeanor domestic battery.

¶ 56 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 57 Affirmed.